WILLIS O. SWITZER

*v.*

STATE OF TENNESSEE.

378 S. W. 2d 760

(*Jackson,* April Term, 1964.)

Opinion filed May 8, 1964.

C. P. J. Mooney and Joseph M. Bearman (on appeal only for plaintiff), W. J. Michael Cody, Memphis, for plaintiff in error.

George F. McCanless, Attorney General, Walker T. Tipton, Assistant Attorney General, for the State.

Mr. Chief Justice Burnett delivered the opinion of the Court.

The plaintiff in error, hereinafter referred to as the defendant, was charged in a two count indictment with

fraudulent breach of trust and grand larceny. The fraudulent breach of trust count charged, in substance, that the defendant fraudulently converted to his own use twenty-four hundred ($2400.00) dollars, which he had received from one Albert Ricci, and which he was obligated by contract to forward to the Appliance Buyers Credit Corporation (ABCC). He was found guilty of fraudulent breach of trust and sentenced to imprisonment in the State penitentiary for not more than four (4) years. From this conviction, he has seasonably appealed in error to this Court.

When the alleged conversion occurred (in October, 1960), the defendant was the president of the Conditioned Air Company, a retail outlet for the sale of Carrier air-conditioning and heating equipment. He had purchased the company's name and certain of its assets and liabilities in October, 1958, from Air Temperature, Inc. (Air Temp), a wholesale distributor of the Carrier line in the Memphis area. Even though the company's sales increased rapidly after it was purchased by the defendant, the company was continually in need of working capital. During 1959, it had secured capital by assigning three or four installation contracts to ABCC, a finance company whose apparent purpose is to provide funds for under-capitalized companies. In the early part of 1960, Conditioned Air attempted to procure additional financing from ABCC, but that company refused to buy any more of its contracts until Air Temp agreed to guarantee their payment. Thereafter and on March 28, 1960, Conditioned Air entered into a new agreement with ABCC, whereby Conditioned Air would assign installation contracts to ABCC, and in return, ABCC would advance the company equipment and construction money.

The agreement provided that customer payments were to be made directly to ABCC, and Conditioned Air expressly agreed not to solicit them. However, the agreement went on to provide that should any payments come into the hands of Conditioned Air, they were to be forwarded promptly to ABCC. It was also provided that ABCC had the right to inspect the books of Conditioned Air at any time. Contemporaneous with the signing of this contract, Conditioned Air, ABCC, and Air Temp entered into another agreement whereby Air Temp agreed to guarantee all contracts assigned to ABCC by Conditioned Air, up to a total amount of $50,000.00.

On July 13, 1960, Conditioned Air entered into a contract with Albert Ricci to install an air-conditioning unit in the latter's restaurant for $2400.00. The contract was subsequently assigned to ABCC, and $2400.00 was advanced to Conditioned Air over a period of time. On October 14, 1960, and after the unit had been installed and contract assigned, Ricci gave the defendant a check for the total amount of the contract. The check was not forwarded to ABCC; but instead it was deposited to Conditioned Air's bank account, and Conditioned Air's checks were subsequently drawn against it to pay company bills and expenses. ABCC never received any payments on the Ricci contract.

In February of 1961, Mrs. Frank Pierce, secretary-treasurer of Air Temp, discovered, in examining the defendant's records, that over $26,000.00 in payments (including Ricci's payment) that should have been forwarded to ABCC, had been deposited in Conditioned Air's bank account. When confronted with this, the defendant admitted that he knew the checks had been deposited in the company's account; and stated that the

funds were needed to meet other pressing company obligations. Conditioned Air was subsequently forced into bankruptcy and Air Temp lost approximately $26,000.00 on its guarantee. This prosecution thereafter followed.

By his first five assignments of error, the defendant contends that the evidence preponderates against the jury's verdict and in favor of his innocence. He asserts that the evidence fails to show that he converted the money received from Ricci to his own use, or that a trust or other fiduciary relationship existed between ABCC and himself. In this connection, he also asserts that if the evidence shows the commission of any crime, it is embezzlement and not fraudulent breach of trust. Each one of these three assertions will be considered *seriatim*.

■ The evidence indicated that the company's bookkeeper, Mrs. Scott, normally made the bank deposits; and the evidence further indicated that someone other than the defendant (apparently Mrs. Scott) actually prepared the deposit slip for the Ricci check. (These facts were developed on direct examination of the defendant; Mrs. Scott did not appear as a witness at the trial.) The defendant relies on these facts to rebut the State's contention that he converted the Ricci payment to his own use. In our opinion, these facts are not sufficient to overcome the evidence presented by the State. Mr. Ricci testified that he handed the check to the defendant. While there is no direct evidence that the defendant gave the check to Mrs. Scott for deposit, knowing that it was a payment on an assigned contract, there is circumstantial evidence in the record from which this fact can be inferred. For example: the check was initially received by the defendant who was the president of the

company and who was in charge of its operations; and the defendant himself testified that the company had used some of the payments made on assigned contracts to meet current business expenses. The jury apparently inferred from all of this that the defendant knowingly directed the deposit of the Ricci check to Conditioned Air's bank account. This, coupled with the fact that the defendant signed all of the company's checks, was sufficient to warrant the jury's finding that the defendant converted the Ricci payment.

█ █ In this connection, the defendant also contends that there was no evidence that the money was appropriated to the defendant's personal use, and further that the evidence showed that he intended to repay the money from the proceeds of a government contract he had procured. Neither of these facts present a valid defense to a prosecution for fraudulent breach of trust. Both of them were raised, and dismissed by this Court in the case of *McCommon v. State,* 185 Tenn. 613, 207 S.W.2d 333 (1948), wherein it was said that "good faith and an honest intent to repay at the time of the misappropriation is no defense." See also in this connection the cases of *Raine v. State,* 143 Tenn. 168, 226 S.W. 189 (1920) and *Burke v. State,* 157 Tenn. 105, 6 S.W.2d 556 (1928). In our opinion, the evidence before the jury justified their finding that the defendant appropriated the Ricci check to his own use.

The defendant next contends that there was no evidence of a trust or other fiduciary relationship between ABCC and himself. While recognizing that the contract between ABCC and Conditioned Air provided that any payments on assigned contracts received by him were to be for-

warded promptly to ABCC, the defendant contends that this part of the contract was subsequently modified, and that the payments used in his business were used with the consent of all the parties. to the contract. The modification, the defendant argues, turned their relationship into that of debtor-creditor, and under the authority of *Burke v. State,* supra, this relationship precludes a prosecution for fraudulent breach of trust. This was actually the heart of the defendant's defense below, and is the contention he most strongly urges on this appeal.

The defendant testified that under the contract between these three parties, Mr. Pierce of Air Temp was actually running his business, and that he, the defendant, did nothing important without the advice and consent of Pierce; that under the contract, his business was submitted wholly to the supervision and direction of Air Temp, his guarantor. He further testified that Pierce knew that these funds were being used to pay other company bills and expenses. He stated that he discussed the disposition of each payment received with Mr. Pierce.

Mr. Williams of ABCC testified that some payments on assigned contracts had come to ABCC in the form of Conditioned Air's checks; but he denied that he authorized the use of these payments or knew that they were being used for operating capital. Pierce also denied that he had ever given the defendant permission to use these payments or that he knew they were being used in this manner. He testified that he had made frequent visits to the defendant's business for a period after the execution of the contracts; but that these visits did not continue for the whole year. He further testified that during a few of these visits, he had discovered that certain payments had been deposited to the company's account; but

that whenever he found this, he brought it to the defendant's attention, and checks were immediately drawn on Conditioned Air's bank account, and forwarded to ABCC. He testified that he did not get alarmed at this because the defendant told him that these payments had been inadvertently placed in the company's account by Mrs. Scott.

■ All of this testimony made out a fact question for the jury as to whether or not the defendant was authorized to use these payments in his company's business. This issue was resolved in favor of the State. Thus, in the absence of an authorization to use these funds, their use constituted a breach of the defendant's duty under his contract. The jury did not accept the defendant's contention that he became a creditor of ABCC and we cannot say that the evidence preponderates in favor of his contention.

The defendant further contends that if the evidence showed the commission of any crime it is embezzlement, and not fraudulent breach of trust. He says that this is so because it is uncontroverted that the funds he was alleged to have misappropriated came into his possession from a third person. He argues that this fact precludes a prosecution for fraudulent breach of trust.

While a prosecution for embezzlement might well have been proper if the defendant were one of the persons against whom the embezzlement statute is directed, but this is not the case here. The embezzlement statute (sec. 39-4232, T.C.A.) is directed at certain acts of *officers, agents, employees* and *clerks*. The defendant does not fall into any one of these categories.

■ ■ The relationship between our embezzlement statute and our fraudulent breach of trust statute (sec. 39-4226, T.C.A.) was pointed out in the case of *Hill v. State,* 159 Tenn. 297, 17 S.W.2d 913 (1929), wherein this Court said the following:

"The embezzlement statute is limited in scope. The fraudulent breach of trust statute is more comprehensive and covers many acts of wrongdoing not embraced in the embezzlement or larceny statutes."

In our opinion, the defendant's act came under that part of the fraudulent breach of trust statute which provides as follows: "The fraudulent appropriation of personal property or money by anyone * * * in whose hands or under whose control it may be * * * or any other contract or trust by which he was bound to deliver * * * the thing received * * * is a fraudulent breach of trust."

While it is true that this Court said in *Nelson v. State,* 208 Tenn. 179, 344 S.W.2d 540 (1960), that "Whether the one offense or the other has been committed is determined by the manner in which the property converted came into the hands of the defendant", this is only true when the defendant is an officer, agent, employee, or clerk —when an employment relationship exists. The Nelson case as well as the Hill case, upon which the Court in Nelson relied, both concerned situations in which the defendant was in an employment relationship with the person from whom he appropriated the funds. In our opinion, the quoted language is not applicable where the defendant does not come within the terms of the embezzlement statute.

The instant case is more analogous to the case of *McCommon v. State,* supra, wherein an independent con-

tractor who was duty bound by a contract to deliver, to another, funds received from a third person was indicted and convicted of fraudulent breach of trust. While there are differences in the McCommon case and the instant case, there are many striking similarities, and, in our opinion, the differences are not so significant as to demand a different result in the instant case.

After reading the record and the pertinent authorities, we do not think that the evidence preponderates against the jury's verdict. The defendant's first five assignments of error are overruled.

■ The defendant assigns as error that part of the trial court's charge which was as follows:

"If you find the defendant guilty of this offense beyond a reasonable doubt, your verdict should be 'We, the jury, find the defendant guilty of fraudulent breach of trust as charged in the indictment and fix his punishment at imprisonment in .the State penitentiary for not more than —————— years.' "

The defendant contends that this amounted to telling the jury that they could not sentence him to imprisonment for a number of years and some fraction of a year; that their sentence had to be expressed in whole years.

The trial judge charged, in substance, the form of the verdict set out in sec. 40-2707, T.C.A. At another place in his charge he told the jury that the punishment for a fraudulent breach of trust was imprisonment for not less than three nor more than ten years. The effect of this was to tell the jury the range within which they could fix the punishment if they found the defendant guilty. This of course included fractional years as well as whole

years. We do not think that the quoted charge misled the jury into believing that only whole years could be assessed. The assignment based on the court's charge is overruled.

By his eighth assignment of error, the defendant contends that there is no evidence that the offense was committed in Shelby County.

■ It is well established in this State that the venue may be shown by circumstantial as well as by direct evidence, *Stinson v. State,* 181 Tenn. 172, 180 S.W.2d 883 (1944); and that the venue need only be shown by a preponderance of the evidence and need not be shown beyond a reasonable doubt. *Norris v. State,* 127 Tenn. 437, 155 S.W. 165 (1912); *Stinson v. State,* supra.

■ Both Ricci and the defendant were engaged in business in Shelby County. Ricci gave the check to the defendant in Shelby County and the check was deposited in the Union Planters National Bank which is located in Memphis. The only reasonable inference to be drawn from all of this is that the appropriation took place in Shelby County. The assignment is without merit and is therefore overruled.

Finally, the defendant contends that the court erred in permitting Williams and Pierce to testify concerning eleven other contracts that had been assigned to ABCC by Conditioned Air. The gist of this testimony was that, with the exception of a $500.00 payment, no payments had been received by ABCC on these eleven other assigned contracts. It was stated that the total unpaid balance of these eleven contracts was approximately $26,000.00. The defendant argues that this testimony was improper since it failed to show the commission of

a crime by the defendant, but merely created a suspicion which was highly prejudicial.

Even if the court erred in allowing this testimony because it failed to show that the defendant received and misappropriated these payments, it must be classified as harmless under our harmless error statute (sec. 27-117, T.C.A.), because the defendant freely admitted that these payments were placed in the company's bank account with his knowledge and under his supervision. In fact, the defendant made no attempt on the witness stand to disavow any knowledge of these payments and the manner in which they were handled. On the contrary, he stated that this was the only way he could operate. His only real defense was that everyone knew that he was doing this. But as we have heretofore pointed out, the jury refused to believe that such was the case.

Finding no error in the record, it results that the judgment of the trial court must be affirmed.