James Lester BRAZIEL,
Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

May 13, 1975.

Certiorari Denied by Supreme Court
Sept. 2, 1975.

Howard G. Swafford, Jasper, for plaintiff-in-error.

R. A. Ashley, Jr., Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Nashville, J. William Pope, Jr., Dist. Atty. Gen., Pikeville, for defendant-in-error.

## OPINION

OLIVER, Judge.

Represented in his trial by retained counsel who was thereafter appointed by the court to represent him in his appeal, James L. Braziel was convicted of second degree murder upon an indictment charging him with the first degree murder of Steve Brewer in May of 1973, and was sentenced to the minimum statutory punishment of imprisonment in the penitentiary for 10 years. (TCA § 39–2408). He is now before this Court upon his appeal in the nature of a writ of error.

It appears that at the time of the homicide this defendant was a juvenile, under 18 years of age, and that in a proceeding in the juvenile court of the county the juvenile judge ordered him held for prosecution as an adult in the Circuit Court. Assignments complaining of that proceeding and the juvenile judge's action are reserved for later consideration herein.

■ By one Assignment of Error the defendant challenges the sufficiency of the evidence to sustain a conviction of second degree murder, insisting that the proof, viewed in its most favorable light to the State, established no greater offense than voluntary manslaughter.

We summarize the material evidence. When a Marion County deputy sheriff, responding to a call, went to the home of John Grimes in that county, he found 17-year-old Steve Brewer dead, a gunshot wound in his chest, his head on the passenger's side of the front seat of a car and his body on the ground. Blood was all around the area where he was, and from the car all the way into the kitchen of the house. The defendant and his brother Sidney were standing on the porch and the defendant was crying. When the officer asked them which one shot the deceased the defendant replied that he did. The officer then advised the defendant concerning his constitutional rights in keeping with the *Miranda* mandate. The defendant, who said he was living at the Grimes home, stated he would get the gun and led the way inside and unlocked a chifforobe door and removed an unloaded .12 gauge double-barreled shotgun and gave it to the officer. One cartridge and one empty shell were found in the living room. In a statement to the deputy, which the trial judge held in a hearing apart from the jury was voluntarily and understandingly made, the defendant said that he and the deceased had been arguing and the deceased slapped him and carried him into the bedroom and threw him onto the bed; that he got up and went to the chifforobe and got the shotgun and stood in the doorway between the bedroom and the living room, with the gun cocked and his finger on the trigger, and told the deceased to stand up and take his hand out of his pocket and if he had a gun to drop it on the

floor; that he shot the deceased when he stood up and he fell back onto the sofa; that the defendant's brother Sidney then helped the deceased to the car; and that he (the defendant) broke the shotgun down and locked it in the chifforobe and ran down the road. The officers found no pistol in the house or at the car. While they were still there, Grimes returned home from work, left the house for some 10 minutes and then came back in carrying a .38 pistol which he claimed he found in the house. The officers did not take that gun from him. The defendant's father was found drunk in a car in the yard.

At the jail about 2:30 the same morning, upon learning the defendant was a juvenile and after permission was obtained from the juvenile judge to hold and interrogate him, he was again advised concerning his constitutional rights by TBI Agent Walker (who died prior to the trial) and, in the presence of the deputy and the coroner, the defendant substantially repeated the same statement above indicated. But he added that when his younger brother Sidney and the deceased came to the house they had been drinking beer and he and they had some discussion about either a car or a pickup truck (the witness did not remember which), and they then all went together to "Tojo's" and got another six-pack of beer and drove around and drank it, drinking only one or two beers himself, and then returned to the house and he and the deceased got into an argument when the latter wanted to watch television and the defendant turned it off and the deceased then slapped him and carried him and threw him on the bed and went back into the living room; that he (the defendant) got the shotgun out of the closet and cocked it and put his finger on the trigger and told the deceased, who had his hand in his pocket, "if you've got a gun slide it on the floor," and when they were 10 or 12 feet apart the shotgun went off unintentionally—he said he did not intend to pull the trigger.

The defendant, who said he was 18 years old and was 17 at the time of the homicide and could not read or write, testified that he had lived in the Grimes home for about 16 years and had known the deceased about a year; that he was working on a car in the yard when his father, his brother and the deceased drove up about 5:00 or 5:30 p. m.; that after some bargaining, the deceased sold a truck to the defendant's father; that after the truck sale transaction, his brother Sidney and the deceased went out and got a six-pack of beer, and when they returned his father and he joined them and they drove to Whiteside to pay one of the father's debts; that on the way back they stopped at Tojo's where he and his brother played pool and the deceased and their father drank beer until about 11:30 p. m. (this was May 3, 1973) and then they all returned to the Grimes home about midnight; that when they got to the house, while his brother Sidney was looking for a jack to fix a flat tire and their father was passed out in the car, he and the deceased went inside and the deceased picked him up and threw him on the bed, "he didn't mean nothing by it he was just playing around . . . we played like that all the time," and it didn't make him mad; that while on the bed he noticed his watch crystal was broken and went over to the chifforobe and opened the drawer to put his watch in there and noticed that Grimes' mother's .38 pistol which was kept in that drawer was gone; that at this time the deceased was sitting on the couch in the living room drinking a beer; that, because Grimes didn't like for anybody to play with the guns and might get mad and whip him and he wanted to put the gun up before Grimes came in, he asked the deceased if he had the gun; that when the deceased made no reply "I asked him, I told him again, I said if you've got the gun put it up before Johnny (Grimes) comes in, and he still didn't say nothing, so I got the shotgun, an old shotgun . . ." and Sidney walked in about that time; "And I walked in there and I said Steve if you've got the gun give it to me I want to take it down to Johnny's sister's and put it up till Johnny comes in. He didn't say nothing he

just smiled at me, and I said give it to me before Johnny comes in if you don't I'll get a whipping, and he pulled it out and pointed it at me, and I said, are you going to shoot me? And he didn't say nothing, and I said, and I said, if, I said Steve lay the gun down and push it to me, and he laid the gun down and pushed it to me and when he did I bent over to pick up the '38, and the 12 guage [sic] shotgun went off"; that he had never fired that shotgun before; that he was scared and nervous and did not mean to hurt the deceased; that after the gun went off he broke it down and unloaded it and placed it and the pistol back where they belonged and ran down the road the short distance to Grimes' sister's house and called an ambulance and came back about 10 minutes later and the ambulance and the deputy sheriff were there; that he was crying and the deputy "walked up to me and asked me what happened, and I told him, and he said, well, take me in the house and give me the gun, and I took him in there and give, I got the gun and he asked me what happened and I told him"; and that he was scared when he talked to the officer and the TBI man and didn't remember much about what he told them.

Upon cross-examination the defendant said that during the truck discussions between his father and the deceased, the deceased wanted a drink of water and he took him inside and gave him one and then made himself a sandwich and they went back outside together, and that he did not know whether the deceased got the .38 pistol but he never saw a gun or the imprint of one in the deceased's pocket during their rounds the rest of the night; that up until they all returned to the house about midnight there had been no arguments or words passed between him and the deceased; that when he stood with the shotgun in the doorway between the kitchen and the bedroom, his thumb was on the right hammer and his finger on both triggers and he did not know how the gun went off; that the hammer must have pulled half-way back and slipped off when he bent over, but he agreed that

to fire the gun a hammer would have to be pulled all the way back and that trigger would have to be pulled; that the only reason he got the shotgun at that hour of the night was to take it to Grimes' sister's house, "he told me if anybody ever started playing with them guns to take it down at his sister's and put all the guns up, give them to her" and was going to take the pistol along also.

The defendant's brother Sidney, 16 years old, corroborated the defendant's story about the shooting almost exactly, testifying that he entered the house and saw the defendant lying on the bed and the deceased sitting on the couch in the living room; that the defendant got off the bed and went to the chifforobe and pulled out the top drawer and then asked the deceased where the pistol was and the deceased made no reply; that the defendant got the shotgun and went in the living room and told the deceased he wanted the pistol to take it to Grimes' sister's house; that the deceased pulled the gun from his pocket and pointed it at the defendant, and the defendant asked the deceased if he was going to shoot him and again the deceased made no reply; that the defendant then told the deceased to lay the gun down on the floor and slide it to him, and the deceased did so; that the defendant reached down for the pistol and the shotgun went off; that the deceased jumped up and started to run out the door and he caught him and started helping him outside, while the defendant stood on the floor crying; that the defendant then went to Grimes' sister's house to call the police; and that he never heard any argument between the deceased and the defendant. Sidney's cross-examination did nothing to bolster his veracity, to say the least of it.

It was stipulated that the spent shell found in the house was fired from the left barrel of the shotgun.

Tested by the time-honored rules governing appellate review of the evidence in criminal cases when its sufficiency is challenged on appeal, *Webster v. State*, 1 Tenn.

Cr.App. 1, 425 S.W.2d 799; *McGill v. State*, 4 Tenn.Cr.App. 710, 475 S.W.2d 223, certainly this record fully justified the jury in finding the defendant guilty of second degree murder and amply supports that verdict.

As we understand it, the essence of the defendant's insistence is that the evidence failed to establish that he acted with malice aforethought in killing the deceased and that, therefore, at most it was sufficient to warrant his conviction of manslaughter only. Both our Supreme Court and this Court have frequently reviewed the law of this State with reference to the element in malice in homicide cases. We did so in *Francis v. State* (Tenn.Cr.App.), 498 S.W.2d 107:

> " 'Every homicide is presumed to be malicious in the absence of circumstances rebutting this implied presumption. *Harper v. State*, 206 Tenn. 509, 334 S.W.2d 933; *Gann v. State*, 214 Tenn. 711, 383 S.W.2d 32.

> " 'Killing with a deadly weapon raises a presumption of malice sufficient to justify a finding of murder in the second degree, in the absence of facts or circumstances rebutting that presumption. *Nance v. State*, 210 Tenn. 328, 358 S.W.2d 327; *Gann v. State*, supra; *Bostick v. State*, 210 Tenn. 620, 360 S.W.2d 472; *Smith v. State*, 212 Tenn. 510, 370 S.W.2d 543.

> " 'In such cases the burden is upon the State to establish that the killing constituted murder in the first degree, if such is charged, and the defendant has the burden of showing mitigating facts and circumstances sufficient to reduce the degree of the homicide below second degree murder. So it is that malice is an essential ingredient of murder in the second degree. *Harper v. State*, supra; *Smith v. State*, supra. If one person, upon a sudden impulse of passion, without adequate provocation, and disconnected with any previously formed design to kill, kills another willfully and maliciously, such killing is unlawful and is murder in the second degree. Malice is not necessarily confined to an intention to take the life of the deceased, but includes an intention to do any unlawful act which may probably result in depriving the party of life. It is not so much spite or malevolence to the individual in particular as an evil design in general, the dictates of a wicked and depraved and malignant heart. It may be either express or implied in law. *Warren v. State*, 44 Tenn. 130. See also: 1 Wharton's Criminal Law & Procedure (Anderson), § 63.

> " 'Of course it is fundamental that the jurors are the sole and only judges of the evidence, and of the weight to be given to the swearing of each and every witness in the case. The credibility of the witnesses, the weight and value of their testimony, the inferences to be drawn from their statements, and all factual issues raised by the testimony and evidence introduced—direct and circumstantial, are matters entrusted exclusively to the jury as the triers of the facts. *Humphrey v. State*, 187 Tenn. 377, 215 S.W.2d 791; *Cole v. State*, 187 Tenn. 459, 215 S.W.2d 824; *Steele v. State*, 189 Tenn. 424, 225 S.W.2d 260; *Smith v. State*, 205 Tenn. 502, 327 S.W.2d 308; *Hardin v. State*, 210 Tenn. 116, 355 S.W.2d 105. Thus, the jury has the duty and prerogative in homicide cases of determining the question of malice and whether or not the defendant proved facts or circumstances sufficient to rebut the presumption of malice arising from the fact of the killing. *Gray v. State*, 63 Tenn. 331.' "

See also: *Fox v. State*, 1 Tenn.Cr.App. 308, 441 S.W.2d 491; *Gordon v. State* (Tenn.Cr.App.), 478 S.W.2d 911; *Bailey v. State* (Tenn.Cr.App.), 479 S.W.2d 829; *Bunch v. State*, 3 Tenn.Cr.App. 481, 463 S.W.2d 956; *Clarke v. State*, 218 Tenn. 259, 402 S.W.2d 863.

■ The contention urged upon us by the defendant in his second Assignment of Error is that he was an illiterate and imma-

ture juvenile when arrested and that he was denied his constitutional right of due process of law when officers interrogated him without permitting his parents or a juvenile officer or an attorney to be with him, and that the inculpatory custodial statements were obtained illegally and were involuntary and inadmissible. We cannot agree. As already noted, when the deputy sheriff arrived at the Grimes home and saw Steve Brewer dead in the yard and asked the defendant and his brother Sidney, who were standing on the porch, which one of them shot the deceased the defendant replied that he did. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process, when the investigation has not progressed beyond general inquiry, is not forbidden and statements made in those circumstances are admissible. *Tate v. State*, 219 Tenn. 698, 413 S.W.2d 366; *State v. Morris*, 224 Tenn. 437, 456 S.W.2d 840; *Ballard v. State*, 2 Tenn.Cr. App. 431, 454 S.W.2d 193; *Gordon v. State*, supra; *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

As further noted, the deputy sheriff then advised the defendant fully concerning his constitutional rights as required by *Miranda, supra,* and a TBI agent repeated that advice at the jail, in both instances before any custodial interrogation of the defendant was undertaken. After the deputy advised the defendant of his rights at the scene, he said he would get the gun and led the way into the house and turned it over to this officer and told him what had happened. At the jail when the TBI agent advised him about his rights, the defendant told him the deputy sheriff had already advised him of his rights, and then proceeded to give the TBI agent the statement above indicated.

We have also indicated that, at the conclusion of a hearing apart from the jury, the trial judge found and held that the defendant was fully advised of his rights in accordance with *Miranda, supra,* and that the officers did not take any undue advan-

tage of him and he knew what he was doing, and overruled defense objections and held his custodial statements were admissible.

■ The trial court's determination with reference to compliance with the *Miranda* mandate by the investigating officers and as to the voluntariness of statements made by the defendant during custodial interrogation, is conclusive on appeal unless the appellate court finds that the evidence touching those matters preponderates against the trial judge's findings. Upon appeal, the defendant has the burden of showing that the evidence preponderated against such a finding by the trial judge. *Briggs v. State* (Tenn.Cr.App.), 501 S.W.2d 831 and cases therein cited; *Mitchell v. State*, 3 Tenn.Cr.App. 494, 464 S.W.2d 307.

■ Although it does not appear that the defendant did expressly waive his constitutional rights when advised concerning them, this Court has held that a waiver may be inferred from the facts of the case and that proof of an affirmative statement by the defendant to that effect is not essential. *Briggs v. State, supra; McGee v. State*, 2 Tenn.Cr.App. 100, 451 S.W.2d 709; *Bowling v. State*, 3 Tenn.Cr.App. 176, 458 S.W.2d 639; *Mays v. State* (Tenn.Cr.App.), 495 S.W.2d 833.

■ The voluntariness and admissibility of a juvenile's confession is not dependent upon the presence of his parents or attorneys at the interrogation when there has been a full *Miranda* warning given and understood. *O'Neil v. State*, 2 Tenn.Cr. App. 518, 455 S.W.2d 597; *Vaughn v. State*, 3 Tenn.Cr.App. 54, 456 S.W.2d 879. A juvenile's confession or admission voluntarily given to police authorities after being fully warned and advised concerning his constitutional rights is admissible at his trial. And this is true even though his confession or admission is made before he is taken before a juvenile court. *Mitchell v. State, supra* ; *O'Neil v. State, supra.*

■ Upon this record we cannot say that the evidence preponderates against the

finding of the trial court, or that it was error to admit the custodial statements of the defendant in evidence before the jury. Accordingly, we must overrule his Assignment complaining about admission of those statements.

■ But beyond that, the defendant related the details of the killing and the attendant facts in his direct testimony. And this brings into operation the firmly established rule of law that where a defendant takes the witness stand in his own behalf and admits the substance of extra-judicial statements made to officers, admission of those statements is not prejudicial. *Owens v. State*, 202 Tenn. 679, 308 S.W.2d 423; *McClain v. State*, 1 Tenn.Cr.App. 499, 445 S.W.2d 942.

■ The defendant is confronted by the rule of law that alleged error in the admission of evidence is cured if the accused elicits and develops, or testifies on direct examination concerning, the same subject matter. *Snowball v. State* (Tenn.Cr.App.), 477 S.W.2d 240; *Lester v. State*, 216 Tenn. 615, 624, 393 S.W.2d 288, 292; *Batchelor v. State*, 213 Tenn. 649, 378 S.W.2d 751. In *Lester*, our Supreme Court said:

"There are many cases in this jurisdiction and others which deal with the broad principle that if a defendant testifies in substance as to evidence which has been otherwise erroneously admitted, then his testimony clears whatever error there might have been. See *Zachary v. State*, 144 Tenn. 623, 234 S.W. 758; *Moon v. State*, 146 Tenn. 319, 242 S.W. 39; *Switzer v. State*, 213 Tenn. 671, 378 S.W.2d 760; *Owens v. State*, 202 Tenn. 679, 308 S.W.2d 423; *Cathey v. State*, 191 Tenn. 617, 235 S.W.2d 601; and others. Thus, these cases clearly show that the rule is not limited to the situation where the defendant takes the stand and admits he committed the crime with which he was charged."

We turn now to the defendant's first Assignment complaining about the juvenile court proceedings. The homicide occurred shortly after 12:00 a. m. on May 4, 1973. In the record we find a Xerox copy of each of the following documents: (1) a petition filed in the juvenile court by deputy sheriff Clarence Hamilton, who was the first officer on the scene and who arrested the defendant and took him to the county jail, reciting that he was a juvenile 17 years of age and charged with murder, (2) a juvenile court summons issued on May 4, 1973 requiring the defendant to appear before that court on 8 May 1973 at 9:00 a. m. to answer the petition, and showing a return signed by Deputy Hamilton showing that on the same day the summons was served on the defendant and a copy of the petition was delivered to him, and (3) the juvenile judge's order made on 8 May 1973, following a hearing upon the petition, directing that the defendant be held for prosecution and sentencing as an adult in the Circuit Court of Marion County pursuant to TCA § 37–234. The murder indictment was returned against the defendant by the grand jury on June 4, 1973. He was tried and convicted on October 26, 1973.

The defendant's only complaint about the juvenile court proceedings, voiced first in a motion to dismiss filed on 24 October 1973 and repeated in his new trial motion and here, is that the juvenile court did not keep minutes of the proceedings as required by TCA § 37–224.

■ In the first place, no imperfection or defect whatever appears on the face of the indictment. Hence, the motion to dismiss it, equivalent to a motion to quash, was ill-advised and untenable. *Cook v. State* (Tenn.Cr.App.), 506 S.W.2d 955. Secondly, the motion was only a pleading and constituted no proof of the statement therein that minutes of the proceeding were not kept by the juvenile court. The law is settled that, nothing else appearing, a pleading is not evidence of the facts or matters averred. *Evers v. Hollman*, 196 Tenn. 364, 268 S.W.2d 97; *Feder v. Flattau*, 205 Tenn. 111, 325 S.W.2d 555. As the trial

judge stated in overruling that motion presented the day of the defendant's trial, there was no proof that minutes were not kept by the juvenile court. Moreover, as the trial court correctly stated while considering the motion, the defendant could have appealed to the Circuit Court if dissatisfied with the judgment of the juvenile court. TCA § 37–258. Finally, the defendant has pointed out no way in which he was prejudiced by the alleged failure of the juvenile court to keep minutes of its proceedings in his case, and upon this record we do not perceive any.

The defendant concedes that his third Assignment with reference to the court's charge is unfounded.

Affirmed.

WALKER, P. J., and O'BRIEN, J., concur.