**STATE of Tennessee, Appellee,**

v.

**Timothy C. STOUT, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Jan. 16, 1984.

Permission to Appeal Denied by Supreme Court March 19, 1984.

Max E. Wilson, Mountain City, for appellant.

William M. Leech, Jr., Atty. Gen. & Reporter, Steven A. Hart, Asst. Atty. Gen., Nashville, William R. Mooney, Asst. Dist. Atty. Gen., Johnson City, Steve Ganter, Asst. Dist. Atty. Gen., Erwin, for appellee.

## OPINION

DWYER, Judge.

The appellant, a juvenile tried as an adult, appeals as of right from his conviction for murder in the second degree with punishment set at confinement for twenty years.

There are six issues, the first of which contests the sufficiency of the evidence to support the verdict. With this in mind, we will narrate the evidence based on our review of the record.

The appellant lived with his Aunt Venia Stout in the Doe Valley area near Mountain City. Appellant's uncle, Homer Stout, resided in a nearby house, while Billy Joe Stout, who was Homer's brother and appellant's father, lived in a cabin on Venia's property. As one witness described it, the houses were so close to each other that family members "could stand in the yard and holler at one another."

Joe Eller, a Doe Valley merchant, testified that on January 8, 1982, Homer sold him a B.B. gun, a camera, and certain other articles for twenty-five dollars. The witness had earlier seen Homer walking across a field accompanied by a man wearing a blue coat with a white stripe on the sleeve. Shortly after Homer left, appellant came into the witness's store wearing the same blue jacket with white stripes and claimed that the articles were his and Ho-

mer had stolen them. The merchant told appellant that if this was true he should obtain a warrant for his uncle's arrest, at which time appellant left the premises.

Homer, Billy, and the appellant spent much of the evening of January 8 drinking beer together. Appellant's father and a neighbor both testified that appellant repeatedly complained to Homer that he wanted six dollars which Homer supposedly kept from him. Homer's widow testified that around 6:30 or 7:00 p.m. on the night of the murder, appellant told her: "I come up here to tell that thing to never come back down there again."

The Johnson County Sheriff's Department received a call around 11:00 p.m. on January 8, 1982, from appellant, who reported that his uncle was seriously injured. A deputy testified that when he arrived, appellant was in an excited state and was without a shirt even though it was extremely cold. Appellant directed the police to the back of Venia Stout's house, where Homer's lifeless body was found. The decedent was lying on the ground with a wooden club across his chest, and miscellaneous items such as a flashlight, wallet, and tobacco can had been placed in a neat pile at his feet. A second wood club was discovered in the vicinity a few days later. Spots of blood were found on the back wall of the house several feet from the body, and appellant had blood on his neck, feet, and hands. Blood spots were also observed on the floor inside Venia's home. The deputy testified that he found a pair of dark-framed glasses in the house and gave them to the appellant, who claimed that they were his; these glasses could not be found on a subsequent search. There was testimony that the victim wore dark-framed glasses and that appellant had never worn glasses.

Billy Joe emerged from his cabin after the police arrived and was promptly arrested for public drunkenness. The decedent had a blood alcohol content of .35 and Billy registered .33. The F.B.I. examiner who tested the blood specimens related that

these were among the highest levels he had ever seen.

A pathologist testified that the victim suffered multiple depressed fractures of the skull, the left side of the chest was fractured, and the left lung was lacerated. He related that the injuries resulted from multiple blows from a blunt object, with the fatal blow shifting the heart to the right, causing cardiac arrest.

The appellant, testifying in his own behalf, stated that he saw his father and the decedent crossing a field on the way to Eller's store on January 8, 1982. Homer sold Mr. Eller some of appellant's personal belongings and used the money to buy beer. Appellant acknowledged asking his uncle for six dollars, which was the amount he figured Homer had left after purchasing the beer. Later that evening, appellant's father allegedly asked him where his "sticks" were. This was a reference to a pair of "numb chucks" (a weapon consisting of two wooden clubs tied together) which appellant had brought home from a shop class at school. Appellant identified the clubs found at the murder scene as his "numb chucks". Billy allegedly threatened to use the clubs on Homer if he caught him stealing beer. Appellant testified that he went to Homer's house and tried to warn him of his father's threat. He denied telling Homer's wife "to tell that thing to stay away." Appellant stated that after he went to bed that night, he heard a noise, got up, and went to his father's house, where he found his father sitting in a chair and breathing hard. He then went to check Venia's back yard, where he found the body. He related that he picked Homer up by the shoulders and shook him, getting blood on himself in the process. Appellant denied any confrontation with the deputy regarding the eyeglasses. A nurse testified for the defense that she could not say that Billy was drunk when he was brought to the hospital on the night in question. Appellant's mother testified that Homer and Billy did not get along when they were drinking. Summed up, the defense theory was that appellant's father was the most likely person to have killed Homer.

■ The verdict of the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in favor of the theory of the State. *State v. Hatchett*, 560 S.W.2d 627 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832 (Tenn. 1978).

■ While it is true that there were no eyewitnesses to the homicide, the record in this case contains ample circumstantial evidence from which a rational trier of fact could and did infer that appellant bludgeoned his uncle to death with his "numb chucks". On the day of the slaying, appellant claimed ownership of items which Homer had sold to Joe Eller. Appellant was seen arguing with his uncle that afternoon over six dollars that Homer allegedly owed him. He told the decedent's widow to "tell that thing to never come back down there again." When the police arrived at the murder scene, appellant was in an excited state, with spots of blood on his neck, feet, and hands. He admitted ownership of the club which was found lying across the decedent's chest. There was testimony that appellant claimed as his a pair of eyeglasses found in Venia's house shortly after the murder and that while appellant did not wear glasses, the victim did. Appellant attempted to place the blame for the homicide on his father, but with proof that his father was extremely intoxicated on the night in question and was thus unlikely to be capable of administering the type of severe beating involved here, the evidence amply supports the jury's rejection of appellant's theory. The evidence meets the requirements of T.R.A.P. 13(e), and the issue is overruled.

■ In his second issue, appellant, who was sixteen at the time of the slaying, urges that he was erroneously tried as an adult. Much of the evidence presented at the juvenile hearing was the same as the evidence outlined here. The juvenile court

noted several of the factors set out in T.C.A. § 37–234. Appellant had a prior juvenile record, the offense was against the person, and it was committed in an aggressive, premeditated manner. There was no evidence that appellant was mentally ill or retarded, and reasonable grounds existed to believe that appellant committed the offense. With the requisites of T.C.A. § 37–234 being met, this issue is overruled.

■ The third issue attacks the admission into evidence of test results from a blood sample taken from appellant. No objection was made to the seizure of the blood sample or the admissibility of the test results until the motion for new trial. In the absence of a timely objection, the issue is waived. *See State v. Waycaster,* 566 S.W.2d 846 (Tenn.1977). Moreover, except for the decedent's "Type A" blood found on the club, none of the blood spots found on the other tested items could be positively identified. Appellant admitted that the blood found on him came from the decedent when he allegedly shook him. The test results showing that appellant had "Type B" blood would neither incriminate nor exculpate him, and appellant has not demonstrated how he would have been prejudiced by the admission of this evidence. The issue is without merit and is overruled.

■ In his next issue, appellant charges the trial court with an abuse of discretion in admitting certain photographs of the crime scene into evidence. The first photograph shows the victim's foot and a pile of items a short distance from the body, including a flashlight, a billfold, and some tobacco products. No blood is visible and there is nothing offensive about the picture. This was relevant to depict the crime scene. A second photograph shows the electric utility meter on the rear wall of the house behind which the body was found. Although spots of blood are visible, the scene is not gruesome or sickening. This photograph was relevant to show that the murder took place behind the house and arguably relevant to show that the victim was killed by repeated blows. The last photograph shows the body lying on its left side with the club lying across the decedent's left arm. Blood is visible on the club and the victim's hands. The trial judge covered the portion of the picture showing the decedent's face so that no injuries or wounds are visible. This photograph was relevant to depict the position of the body and the murder weapon. The position of the victim was of particular significance in light of appellant's claim that he got blood on himself by shaking the body. The relevance of this evidence outweighs any prejudice. We find no abuse of discretion in allowing the photographs to be admitted. *See State v. Banks,* 564 S.W.2d 947 (Tenn. 1978). The issue is overruled.

■ Appellant next contends that the trial court erred by allowing the State to introduce a statement he made to the police. In a pre-trial hearing, the State urged the trial court not to allow the statement into evidence, and at that time appellant opposed the motion. The State's motion was granted. Later in the trial, the State sought to have the statement introduced, saying that the impeachment of an earlier State's witness, Billy Joe Stout, had caused a change of tactics. At a jury-out hearing, it was developed that the statement was taken on the morning after the homicide. The investigating officers advised appellant of his *Miranda* rights, no threats were made, and appellant's uncle was present throughout the interrogation. The trial court allowed the introduction of the statement. To accommodate any surprise to appellant, the court told him he could recall any witness for further questioning regarding the statement. Appellant has not explained how he might have been prejudiced by the admission of this evidence. When he took the stand, he testified in substance to the same facts contained in the statement to the police. There was no prejudice under these circumstances. *See Braziel v. State,* 529 S.W.2d 501, 507 (Tenn.Cr.App. 1975). This issue is overruled.

■ The last issue challenges the trial court's refusal to permit appellant to cross-examine State's witness Billy Joe Stout concerning a prior conviction. During di-

rect examination by the State, the witness admitted to one prior conviction but denied being convicted of any other felonies. During cross-examination, he admitted that he had been jailed for armed robbery in California and attempted to explain why he did not mention this conviction. A jury-out hearing was called at this point, during which it was developed that the conviction occurred in 1961. The witness explained that he was placed on work release for the offense, and after a period of probation, he was told by his probation officer that his record would be clear. Mr. Stout explained that he did not intentionally lie about his record and thought the probation officer meant that he had not actually been convicted for the offense. The trial court ruled that this conviction could not be used for impeachment purposes because it was more than ten years old, and appellant had not given the State notice that he intended to use the conviction. *See State v. Morgan,* 541 S.W.2d 385, 388–89 (Tenn.1976). Under these circumstances, the trial judge did not abuse his discretion in disallowing further cross-examination of the witness regarding the conviction. This issue overruled, the judgment of the trial court is affirmed.

DAUGHTREY and CORNELIUS, JJ., concur.