# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 12, 2004 Session

## STATE OF TENNESSEE v. JAMES D. NICHOLSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-C-2381      J. Randall Wyatt, Jr., Judge**

---

**No. M2004-00111-CCA-R3-CD - Filed January 25, 2005**

---

On appeal, the defendant challenges the trial court's denial of his motion to suppress. After careful review, we conclude that, under the facts presented, the defendant was seized when the officers instructed the defendant to "hold up," pursued him on foot, and eventually apprehended him. Moreover, we hold that the detectives lacked reasonable suspicion or probable cause to effectuate the stop. Therefore, we reverse the findings of the trial court, the evidence flowing from the illegal seizure is suppressed, the defendant's conviction is vacated, and the charges are dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Dismissed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES, J., JOINED. GARY R. WADE, P.J., filed a dissenting opinion.

James O. Martin, III, Nashville, Tennessee, for the appellant, James D. Nicholson.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Michael D. Rohling, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

At issue in this appeal is whether a "seizure" within the meaning of the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution occurred when the defendant, James D. Nicholson, was instructed to "hold up," pursued on foot, and eventually apprehended and questioned. Moreover, we are to determine, if in fact the defendant was seized, whether sufficient justification existed to warrant the seizure.

At the suppression hearing conducted by the trial court, Detective Ryan Lockwood testified as the sole witness and related the facts surrounding the encounter at issue in this appeal. On July 7, 2003, at approximately 11:30 p.m., Detective Lockwood and other officers from the Intelligence Division and West Flex units were present at the John Henry Hale Housing Projects for the purpose of conducting gang investigations. Upon arriving, the officers observed a large group of individuals around Henry Place, some of whom were engaged in "hand-to-hand drug transactions." As the officers approached in an attempt to gather gang intelligence, several individuals "struck out running." Detective Lockwood testified that he chased one subject, but was unable to apprehend him.

As he returned, Detective Lockwood turned to his right to observe the defendant walking toward Henry Place. In front of what Detective Lockwood testified was a "very strong police presence," he "squared more to [the defendant] and told him to hold up," upon which the defendant turned and ran. Detective Lockwood and two other detectives chased the defendant while ordering him to stop. After a brief struggle, the detectives apprehended the defendant and subdued him. Once the defendant was on the ground, the detectives asked the defendant his name and his purpose for being at the location. He refused to identify himself to the officers and told them that he was visiting someone, but refused to reveal the name of the person or tell the detectives where the person lived. When asked to produce identification, he responded that he did not have any on his person.

At that time, the detectives placed the defendant under arrest for trespassing. A search incident to arrest yielded 6.1 grams of crack cocaine and $1060 in cash. After some time, two of the detectives determined the defendant's identity based on a prior incident involving the defendant. At that point, they realized that the defendant had outstanding warrants. Subsequently, the defendant made several incriminating statements.

On cross-examination, Detective Lockwood admitted that he did not initially recognize the defendant, that he had not seen the defendant earlier that night, and that he did not have any reports on the defendant. He further testified that when he saw the defendant, the defendant was not engaged in any illegal conduct. Finally, Detective Lockwood admitted that the drugs and money were only recovered after the defendant was physically restrained.

The trial court found that the initial encounter between Detective Lockwood and the defendant did not amount to a seizure and was supported by the previous events and the circumstances surrounding those events. Moreover, the trial court found that those same facts and circumstances, coupled with the defendant's flight, provided a basis to "pursue and apprehend the defendant." Finally, the trial court found that the ensuing arrest and search incident to arrest were "in no way illegal or unconstitutional."

For the reasons stated herein, we reverse and hold that the defendant was indeed seized when, in the presence of multiple officers, the detective instructed the defendant to "hold up," pursued him on foot, and eventually apprehended him. Because the officers lacked probable cause or reasonable

suspicion to effectuate such a seizure, the evidence is suppressed, the defendant's conviction is vacated, and the charges are dismissed.

## Standard of Review

When assessing the correctness of a trial court's ruling on a pretrial motion to suppress, an appellate court must uphold the trial court's findings of fact unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to determine the credibility of witnesses, the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. Odom, 928 S.W.2d at 23. Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). If the issue presented involves the application of law to undisputed facts, our review is *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). Finally, the defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

## Analysis

In State v. Daniel, 12 S.W.3d 420 (Tenn. 2000), our supreme court enumerated three different types of interactions between police and citizens. In so doing, it differentiated between a short investigatory detention requiring reasonable suspicion, otherwise known as a Terry stop, and a brief encounter in which an officer merely approaches an individual in a public place to ask questions, which requires no objective justification and does not implicate constitutional protections. Daniel, 12 S.W.3d at 425. To further illuminate the subject, the court noted:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

Daniel, 12 S.W.3d at 425 (quoting Florida v. Royer, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983)).

In contrast to this benign type of encounter, when an individual is seized, constitutional protections are triggered and sufficient grounds must exist to warrant the seizure. Our supreme court

clarified the definition of seizure in the landmark case of State v. Randolph, 74 S.W.3d 330 (Tenn. 2002). In Randolph, our supreme court rejected the federally-adopted definition of seizure as enunciated in California v. Hodari D., 499 U.S. 621, 111 S. Ct. 1547 (1991), in favor of a more stringent and protective standard. While Hodari D. held that a person is only seized "where an officer uses physical force to detain an individual or where a person submits or yields to a show of authority by the officer," the highest court of our state held that the pertinent question is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave." Randolph, 74 S.W.3d at 335 (quoting Hodari D., 499 U.S. at 626, 111 S. Ct. at 1550). Thus, our courts are to employ the more rigid totality of the circumstances test to determine if the individual was indeed seized, thus invoking constitutional protections.

The Randolph court further noted several factors, previously identified in Daniel, which are helpful in making a determination of whether or not an individual has been seized, including:

> [T]he time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Randolph, 74 S.W.3d at 336-37 (citing Daniel, 12 S.W.3d at 425-26).

Moreover, while the analysis is "necessarily imprecise," there are well-settled examples of both seizures and encounters that do not rise to the level of a seizure:

> [T]he Fourth Amendment is not implicated and no seizure occurs when police approach an individual, in a public place, or in a parked car, ask questions, and request to search, so long as police do not convey a message that compliance with their requests is required. On the other hand, courts have typically held that an encounter becomes a "seizure" if an officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

Daniel, 12 S.W.3d at 426 (citing 4 Wayne R. LaFave, Search and Seizure § 9.3(a), at 104 (3d ed. 1996 & Supp. 1999) (collecting cases)).

These cases indicate that the line of demarcation is drawn at the officer's communication of mandatory compliance with his or her request, as opposed to voluntary compliance by the citizen. In sum, if the totality of the circumstances indicates to a reasonable person that he or she is not free to leave, but rather would be required to accede to the officer's requests, the individual is seized, constitutional protections are triggered, and reasonable suspicion is required to effectuate the stop. Daniel 12 S.W.3d at 425. Furthermore, this belief could be the product of actual physical force or

restraint, or merely a display of authority, as long as it is sufficient to objectively indicate mandatory compliance. See Randolph, 74 S.W.3d at 338; Daniel, 12 S.W.3d at 426.

Bearing this in mind, a requisite step in our analysis is to determine if the initial encounter between the detective and the defendant in this case amounted to an investigatory stop requiring reasonable suspicion or if it was merely an officer requesting information, insufficient to establish an objective belief that the defendant would not be free to leave. Initially, we note that our assessment is necessarily fact-intensive; however, we are also mindful that the applicable test mandates that we consider not merely one factor or another, but rather the tenor of the encounter as a whole. Moreover, we employ the objective standard of the reasonable person in like circumstances, so as to ensure that "the scope of these constitutional protections does not vary depending upon the subjective state of mind of the particular citizen being approached." Daniel, 12 S.W.3d at 425.

Particularly instructive in our analysis is the factual similarity and reasoning employed in Randolph. In that case, an officer observed the defendant four blocks from the site of a possible burglary in progress. Randolph, 74 S.W.3d at 332-33, 338. Upon receiving a description of the suspect as a white male, the officer acted on a "hunch," activated his blue lights, and ordered the defendant to stop. Id. at 338. Ignoring the officer, the defendant continued to ride away on his bicycle. Id. at 333. Upon again ordering the defendant to stop, the defendant "rode away faster." Id. When he was eventually apprehended, the defendant was discovered to have in his possession several items which linked him to the burglary. Id. In suppressing the evidence, the supreme court held that "the defendant was seized when the officer activated the blue lights on his patrol car, ordered the defendant to stop, and pursued him for several blocks." Id. at 338.

In the present case, officers attempted, albeit unsuccessfully, to track down individuals they observed conducting hand-to-hand drug transactions. Detective Lockwood specifically stated that he chased one individual from the group, whom he lost sight of after the subject turned a corner. As the detective walked back, he turned to observe the defendant, whom he did not recognize from the earlier group, walking towards Henry Place. Detective Lockwood called to the defendant to "hold up," upon which the defendant turned and ran. At that point, three detectives pursued the defendant on foot until they apprehended him after a brief struggle.

Q: And you were by yourself, at this point; is that right, when you first saw [the defendant]?

A: In - in closest proximity to him, yes. However, there were several uniformed officers just up the hill from where I was, with their cars parked at the top of Henry place [sic].

Q: Okay.

A: So there was a very visible uniformed police presence during this whole thing.

Q: I understand. And you said you, clearly, identified yourself as a police officer.

A: That's correct.

Q: There's no question that you were a police officer, and you were chasing him, and you were ordering him to stop.

A: That's correct..
Q: Okay. And during this pursuit or, I guess, the end of the pursuit ended when the other officers took him to the ground.
A: That's correct.
Q: And I think this was three police officers.
A: Two, and then when I came up there.

We conclude that the holding of Randolph is applicable. In the present case, the encounter occurred at night in an area which had recently been the scene of open drug trafficking. The defendant was instructed to "hold up" by a detective in a "raid vest with Metro patches and insignia." Moreover, there was admittedly "a very strong police presence," and Detective Lockwood was accompanied by other detectives who were attired similarly. Failing to comply with the officer's order, the defendant began to run and three detectives chased him for "about a minute," at which time they apprehended the defendant and, after a brief struggle, began to question him.

We are persuaded that, applying the standard enunciated in Randolph under these circumstances, a reasonable person in that situation clearly would not have felt free to leave. Indeed, as shown by the officers' actions, the defendant was not free to leave and, at the very least, was going to be interrogated. Thus, we conclude that the defendant was seized when, in the presence of multiple officers in raid gear, he was instructed to "hold up," was pursued by three detectives on foot, and was eventually apprehended.

Upon concluding that the encounter between the detectives and the defendant constituted a seizure, we must now determine whether there existed any objective justification for the officers' actions. According to the Fourth Amendment to the United States Constitution and Article I, § 7 of the Tennessee Constitution, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Randolph, 74 S.W.3d at 334 (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citation omitted)); see also State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). One such exception arises "when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." Randolph, 74 S.W.3d at 334 (quoting Binette, 33 S.W.3d at 218); see also Terry v. Ohio, 392 U.S. 1, 20-21, 88 S. Ct. 1868, 1879 (1968).

In the present case, the defendant was observed walking near the area where the earlier group had congregated. However, at the point of the initial encounter, the detectives had no evidence connecting the defendant to the group observed earlier or to any other illegal activity:
Q: Okay. When you first saw [the defendant], you didn't recognize him?
A: That's correct.
Q: And you had not seen him before on that night.
A: That's correct.
Q: You didn't have any reports about him.

-6-

A: Specifically, I had none.

Q: Okay. He - and in fact, when you saw him, he wasn't doing anything illegal.

A: That's correct.

In fact, it was only after the defendant had been physically restrained and searched that the officers had any evidence connecting the defendant to any illegal act whatsoever:

Q: And at that point, at the point that he was taken to the ground, you guys had still not seen him do anything illegal.

A: Aside from the fact that we had cause to believe that he was, in fact, trespassing, at the very minimum, and due to the fact -

Q: You didn't know who he was.

A: No. That's correct.

Q: Okay. And while he was on the ground, that's when the drugs were recovered.

A: That's correct.

Q: And the cash.

A: That's correct.

Q: And the statements were made.

A: That's correct.

The State argues on appeal that the defendant's flight provided justification for the detectives' actions. However, we note that this set of circumstances falls squarely within one of the policy concerns that our supreme court noted in endorsing the more protective standard of seizure over that of Hodari D.:

Third, the [Hodari D.] majority's analysis is flawed for practical reasons and is subject to potential abuse by officers who pursue a subject without reasonable suspicion and use a flight or refusal to submit to authority as reason to execute an arrest or search.

Randolph, 74 S.W.3d at 335 (citing Hodari D., 499 U.S. at 638-41, 646-47, 111 S. Ct. at 1557-58, 1561-62 (Stevens, J., dissenting)). Moreover, while we do not wish to encourage flight from officers, especially in areas of high crime, we realize from a practical standpoint that flight does not always amount to reasonable suspicion. In fact, innocent reasons for flight abound in high crime areas, including: fear of retribution for speaking to officers, unwillingness to appear as witnesses, and fear of being wrongfully apprehended as a guilty party. See Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673, 684 (2000) (Stevens, J., dissenting). We are not persuaded that flight, without any other particularized incriminating facts, suffices for reasonable suspicion. Further, we reiterate the factual similarity between Randolph and the present case: in the former, the fact that the defendant accelerated away from the officer on his bicycle when ordered to stop did not establish reasonable suspicion or probable cause to effectuate the seizure. In the latter, the defendant was told to "hold up," upon which he ran from the detectives at the scene. We conclude that, under these facts, reasonable suspicion is not supported.

The detectives in the present case seized the defendant without any specific and articulable facts tying him to any illegal activity, past or present. At the time the defendant was approached, the initial incident was over, the group had dispersed, and the officers were unable to locate the

individual participants. Upon observing the defendant walking by the officers in the suspect area, which of itself seems to lend support to the adverse inference, the detectives acted on a "mere hunch or inarticulable suspicion" that the defendant was engaged in unlawful activity and proceeded to approach and eventually apprehend him. See State v. Dale E. Morrell, No. 03-C-01-9409-CR-00355, 1996 Tenn. Crim. App. LEXIS 47 (Tenn. Crim. App., at Knoxville, Jan. 31, 1996).

In briefly addressing the dissent, we initially reiterate that in Daniel, our supreme court noted that an encounter between an officer and a citizen becomes a seizure if an officer "pursues an individual who has attempted to terminate [the encounter] by departing." Daniel, 12 S.W.3d at 426 (citations omitted). Moreover, that rule was applied and borne out in the court's later holding in Randolph. Upon being instructed to stop, the defendant in that case "rode away faster" on his bicycle; as aforementioned, in that case the supreme court held that the defendant was seized when "the officers activated the blue lights on his patrol car, ordered the defendant to stop, and pursued him for several blocks." We see no distinguishable difference in the facts of the present case. Regardless of the means of transport, when an individual attempts to leave and is pursued by officers, the individual is, at that point, seized.

The dissent further suggests that the defendant's flight "coupled with the other circumstances of the encounter provided the officers with reasonable suspicion to pursue and apprehend him." We again note that in Randolph, the defendants flight on a bicycle was insufficient to constitute reasonable suspicion or probable cause. Further, this Court has previously held that avoidance of a roadblock does not constitute reasonable suspicion, absent specific and articulable facts that the motorist was attempting to evade arrest or detection. State v. Binion, 900 S.W.2d 702, 706 (Tenn. Crim. App. 1994). In the present case, the defendant walked by the officers voluntarily and only fled when he was ordered to "hold up" amongst a "strong police presence." As such, his actions, taken in their totality, do not seem to indicate an evasion of arrest or detection, as he did not avoid the officers altogether or flee upon seeing them.

Moreover, while it is true that the defendant in the present case was walking at night in a housing project, we conclude that these facts are not sufficiently particular such that they would support reasonable suspicion. See State v. Lawson, 929 S.W.2d 406, 409 (Tenn. Crim. App. 1996) (vehicle's presence in a high crime area late at night was not sufficient to support reasonable suspicion); State v. Massey, No. 01C01-9406-CR-00218, 1995 Tenn. Crim. App. LEXIS 736 (Tenn. Crim. App., at Nashville, Sept. 1, 1995) (affirming the trial court's exclusion of evidence obtained pursuant to an investigatory stop where the trial court found that the only reason for the stop was the defendant's presence at night in a high crime area). To further illustrate this point, we contrast the defendant with the subject initially pursued by Detective Lockwood. In that instance, had the individual been apprehended, a valid seizure would have been effected because the detectives possessed a reasonable suspicion of the subject based on the hand-to-hand drug transactions they observed amongst the group before the subject fled. However, to uphold the seizure of the defendant, who was not connected to any illegal activity, would defy the added protection that our supreme court felt was necessary in a case such as this.

We conclude, under the facts presented, that the defendant was seized and that the officers possessed neither reasonable suspicion nor probable cause to effectuate the seizure.

## Conclusion

Based on the foregoing, the evidence flowing from the illegal seizure is suppressed, the defendant's conviction is vacated, and the charges are dismissed.

_____
JOHN EVERETT WILLIAMS, JUDGE