IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 24, 2011

**STATE OF TENNESSEE v. KENNETH D. GANN**

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 268129    Barry A. Steelman, Judge**

_____

**No. E2010-02114-CCA-R3-CD - Filed November 22, 2011**

_____

A Hamilton County jury convicted the Defendant, Kenneth D. Gann, of second degree murder, and the trial court sentenced him to twenty years, to be served at 100%. On appeal, the Defendant contends the trial court erred when it denied his motion to suppress a statement he gave while in the hospital. After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the Appellant, Kenneth D. Gann.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William H. Cox, III, District Attorney General, and Neal Pinkston, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's killing of Robyn Gann, who was his estranged wife. The Defendant does not appeal the sufficiency of the evidence to support his conviction but, instead, he contests the admissibility of a statement that he made to the police, asserting that he did not knowingly and voluntarily waive his *Miranda* rights before he gave his statement to the police. The evidence presented at trial proved that the Defendant killed his estranged wife while she was in her home. He then left and returned to the home with the intent of killing himself. Toward this end, he took pain killers and wrapped a plastic bag

around his head, sealing it around his neck with duct tape. When police officers arrived at the scene, they found the victim's body and also found the Defendant lying on the living room couch, unresponsive and breathing slowly. Police called for emergency personnel, who took the Defendant to the hospital. After some time at the hospital, and after being given *Miranda* warnings by police, the Defendant gave a statement to police. Before trial, he sought to suppress this statement. The parties presented the following evidence at the hearing on his motion to suppress:

Initially, defense counsel stated his position that the Defendant's statement was not knowingly or voluntarily entered because of his physical and mental condition at the time he made the statement. He then called as a witness Rhonda Weaver, a nurse in the Intensive Care Unit ("ICU") at Memorial Hospital North Park, who testified that patients admitted to the ICU were typically "seriously ill." The nurse recalled that while she was working on March 2, 2008, at about 6:45 a.m., the Defendant was transferred to the ICU from the emergency room. She reviewed his medical history from his admission and noted that, upon admission to the emergency room, he was unresponsive to pain, had no gag reflex, or corneal reflex. The nurse explained that to test the Defendant's pain response, hospital personnel rubbed their knuckles against his chest bone. Most patients would shrug or move in some fashion in response, but the Defendant did not. To test his gag reflex, hospital personnel put a tongue blade down past his tongue. This usually caused a patient to cough, indicating that the patient was protecting his airway. The nurse described this reflex as "one of the . . . last things to go." The Defendant did not respond when the tongue blade was placed down his throat. Finally, the nurse explained that to test the Defendant's corneal reflex, a Kleenex was brushed across his eyeball. Most people will blink in response, but the Defendant did not. Nurse Weaver said that, while the Defendant's vital signs were "stable," he was not talking or moving. She said, however, that his lungs sounded normal and he had a normal pulse. The Defendant was described as "unconscious" and "unresponsive" and was diagnosed as having an "[a]noxic brain injury" from the lack of oxygen to his brain.

Nurse Weaver testified that the Defendant's medical reports indicated that he had a plastic bag around his head when police found him and that there were marks on his neck from the bag, indicating the bag was fairly tight. She said that, after he was admitted into the ICU, they monitored his pulse rate, blood pressure, and respirations. At around 7:30 a.m., a "surgical restraint plan" was prepared for the Defendant. The nurse's notes indicated she did not think a surgical restraint was necessary because the Defendant was not moving on his own or making an effort to move on his own. At one point, shortly after 9:00 a.m., his heart rate and blood pressure dropped and he stopped breathing. In response, nurses called a code blue, to which Drs. Pollard and Wagg responded and utilized an "Ambu bag" to provide him oxygen while he was not breathing. Nurses were able to regain normal readings from the Defendant after approximately four or five assisted breaths.

2

Nurse Weaver testified that, after she and other hospital personnel stabilized the Defendant, he remained stable for several hours. The police left the hospital with instructions to nurses that the Defendant's family could go into his room, in part because the medical staff did not think that the Defendant would survive. The Defendant's father and mother went into his room, and, a little bit after 2:00 p.m., the Defendant started "waking up a little bit, opening his eyes." He successfully moved all four of his extremities. While the Defendant was "slow to speak," he correctly answered Nurse Weaver's questions about his name and the identity of his parents. When the Defendant became responsive, the nurse contacted the Hamilton County Sheriff's Department as well as the doctors responsible for treating the Defendant, Dr. Pollard and Dr. Mance. The police informed her they would be there shortly and asked that she have the Defendant's family leave his room.

Shortly thereafter, the police arrived before the Defendant was examined by a doctor. The police went into the Defendant's room where they spoke with him. Nurse Weaver recalled that an officer exited the room and said the Defendant had confessed. The nurse agreed that no doctor had examined the Defendant between the time that he woke up and the time that he confessed. Two doctors, Dr. Mance and Dr. Hicks, examined the Defendant and they ordered that the Defendant undergo a psychiatric examination, which the nurse called for at 6:15 p.m. The Defendant was ultimately discharged to a state mental facility later that evening.

Nurse Weaver noted that, included in the Defendant's chart, was a "certificate of need" that had been prepared by one of the emergency room physicians who had treated the Defendant. This type of certificate was a determination of whether a patient needs to stay in the hospital against his will. The Defendant's certificate stated, "[B]ackground of mental health issues with little treatment, flight risk, suicide attempt, family history of mental illness. Client ha[d] one previous suicide attempt." The certificate also stated, "risk to fle[e], danger to others, suspect in wife's death, continued suicide ideation and no future orientation." This certificate provided a basis for the hospital to hold the Defendant for twenty-four hours.

On cross-examination by the State, Nurse Weaver testified that, after the Defendant spoke with police, she asked him if he was successfully drinking water and if he thought he could eat. While hoarse, the Defendant, who was sitting up in his hospital bed, responded appropriately to her questions.

Upon questioning by the trial court, Nurse Weaver testified that she had a co-worker call the police to come see the Defendant when he woke up. She said that she based this decision solely on the fact that the Defendant "was awake" and thought that the police "should probably know." At this time, the Defendant was talking some, sitting up in bed, and drinking water unassisted. When she asked the Defendant his name, the Defendant

3

responded correctly. He did not, however, answer her when she asked him if he knew the year. He correctly informed her of his parents' names, and, upon being asked, he said he was not hurting anywhere.

Nurse Weaver said that at least four or five different officers came after the hospital staff notified them the Defendant was awake. Nurse Weaver was unsure, but she thought only one officer went into the room with the Defendant when the door was shut. The Defendant was not restrained at the time of the police interview although he was restrained initially upon his admission. The nurse said that the only medications that the Defendant received were IV fluid and also IV Protonix, which was a non-prescription medication for ulcers. Nurse Weaver testified that neither of these medications would have effected the Defendant's mental state or cognitive functioning.

On redirect examination, Nurse Weaver testified that the hospital records indicated that some open packets of an over-the-counter sleep aid were found near the Defendant at the house. On cross-examination, she said that the statement on the certificate of need, which reflected that the Defendant had said he did not deserve to be alive, likely was not made by the Defendant himself. She said his medical chart indicated he was not awake in the emergency room to make that statement, so it was likely relayed to doctors by someone else.

Upon further questioning by the trial court, Nurse Weaver testified that the police entered the Defendant's room several times while he was on her ward. While he was still unresponsive, officers went in and took pictures. Later, when he awoke, several officers, some in plain clothes and others in uniforms, went in and out of the room. Nurse Weaver reiterated that doctors had ordered the Defendant be held for at least 24 hours pending a psychiatric evaluation.

Doctor Cornelius Mance, a clinical neurologist, testified he worked at Memorial North Park Hospital and saw the Defendant upon admission to the hospital. The attending physician called Dr. Mance to examine the Defendant, who had been moved to ICU by that time. The doctor said that he was asked to examine the Defendant for possible brain injury or brain dysfunction. He did not recall exactly what time he examined the Defendant but said it had to be before 4:00 p.m. The Defendant would not speak to the doctor and "sat there with his eyes closed" but complied with all the doctor's requests. Dr. Mance's notes indicated that the Defendant had an elevated level of alcohol, registering at .154 at the time he was admitted to the hospital, and had taken sleeping pills.

Dr. Mance's examination of the Defendant revealed that his blood pressure was 144 over 101, his pulse was 114 beats per minute, and his oxygen saturation was 90% at the time, only slightly lower than normal. The doctor examined the Defendant's head and found

4

abrasions on his neck and noticed that his eye movements were full. The Defendant could open his mouth on command and swallow without difficulty. He could grip using both his hands and move all of his extremities well. The Defendant's sensation appeared intact, and his reflexes were normal. While the Defendant did not talk, he responded appropriately to the question regarding his age, holding up two fingers and then three fingers, to show his age as twenty-three. After the examination, the doctor concluded that the Defendant was "[p]ost-suicidal attempt with hypoxic brain injury, hypertension, alcoholism and urinary tract infection." The doctor noted the Defendant should "do very well" because he did not find any focal neurologic deficits. Dr. Mance told the attending physician that, neurologically speaking, the Defendant could be released from the hospital. Dr. Mance's advice was based solely upon the Defendant's neurological examination and did not account for any subsequently required psychological examination.

On cross-examination, the doctor testified that he was aware before he entered the Defendant's room that the Defendant had been speaking with family. He opined that the Defendant did not have a desire to talk to him. Upon further questioning by the trial court about whether the doctor thought the Defendant was thinking clearly, the doctor said he thought the Defendant's "thought processes were pretty clear." He explained, "So if you do everything I ask you to do and, and it's appropriate, I assume that your thinking is there whether, whether you talk or not." The doctor then recounted the multiple tasks he asked the Defendant to perform and that the Defendant performed correctly. The doctor explained that, while a normal person has an average oxygen saturation level of 94%, the Defendant's level of 90% did not pose a problem. Levels in the lower 80% indicated a "great problem." The doctor indicated that the Defendant's drug screen returned negative, and it would have been positive if the Defendant had ingested most sleeping pills.

Jonathan Watkins, a field training officer with the Chattanooga Police Department, testified that he responded to a "check-well-being" call to police on March 2, 2008, at 3:37 a.m. When he arrived at the address, where a female was supposed to be meeting her estranged husband, he noticed that there were vehicles in the driveway and the lights were on in the house. The officer approached the door and began knocking on it and ringing the doorbell. After no one answered, Officer Watkins looked into the house through a gap in some window blinds, and he saw the Defendant lying on a couch with a plastic bag over his head. The officer then called for back up, and, when back up arrived, he forced entry into the house.

Upon entering the home, the officer immediately approached the Defendant and ensured he was clear of weapons. He then removed him from the couch and removed the bag from his head. The officer noted that the Defendant was breathing "real slow." Officers called for an ambulance and then looked through the rest of the home, where they found the

victim's body. The officer said the Defendant never spoke to him.

On cross-examination, the officer testified that he knew the Defendant was breathing when he first approached the Defendant because he could see the plastic bag going in and out. He also said that he saw small holes along the seem of the plastic bag, which was duct taped around the Defendant's neck. The officer said that the Defendant's eyes were open but that the Defendant never focused on the officer or responded to the officer.

Justin Kilgore, a detective with the Chattanooga Police Department, testified that he was assigned as lead investigator in this case. Upon being so assigned, Detective Kilgore arrived at the victim's house to view it and then, at around 1:15 p.m. when he learned that the Defendant had awoken, went to the hospital. The detective said he entered the Defendant's room and identified himself to the Defendant as a police officer explaining he was there to speak with the Defendant about what had happened at the house. Also present in the room was Sergeant Dean, who remained in the room while the detective informed the Defendant of his Miranda rights and while the Defendant signed the form waiving those rights.

Detective Kilgore said that, when he entered the room, he noted that the Defendant was "tied down" to the bed with a "cloth" binding each arm. The detective said that the Defendant was "in custody" for police purposes because he was not free to leave the hospital, and police had posted a patrol officer outside the Defendant's door to ensure that he did not leave.

The detective recalled that the Defendant appeared "fine" and did not seem to have an issue speaking with the detective. The detective reviewed the rights waiver form with the Defendant, and the Defendant provided personal information needed to complete the form, including that the Defendant went by the name "Dan" and had completed the 12th grade in school. The detective testified that he read each of the constitutional rights listed on the form to the Defendant, and the Defendant signed his initials "K.D.G." by each of those rights. Detective Kilgore also testified that he asked the Defendant if the Defendant understood his rights, and the Defendant signed the form indicating that he understood. The Defendant signed this form at 2:19 p.m., as did the detective and Sergeant Dean.

Detective Kilgore testified that, thirty minutes later, the Defendant gave a recorded statement. The detective recalled that the Defendant was "physically upset" about what had happened but seemed like "any normal person" with no problem communicating with the detective. The Defendant even apologized to the detective about what had happened. The detective said that, after going over the events briefly with the Defendant, he turned on a recording device that he had brought with him to the hospital.

6

The State then introduced the tape recording, upon which the detective is heard identifying himself and the Defendant. After stating some of the facts, the detective asked the Defendant "Is that all correct, Mr. Gann?," and the Defendant responds, "Yes, sir." On the recording, the detective recounts with the Defendant how the two went over the Defendant's constitutional rights and that the Defendant wanted to waive those rights, and the Defendant again responded "Yes, sir." The detective then asked the Defendant about the events that occurred at his estranged wife's house.

On the recording, the Defendant stated that he and the victim had "a lot of problems from the get-go . . . even before [they] even got married." They dated, he said, for a year and a half before being married, and had been married for three years at the time of this incident. He said that he had met the victim when the victim was dating his friend. He said he was there anytime the victim "needed" him but that, when he "was out of money," she would go back to her ex-boyfriend. This behavior continued until the victim became pregnant with his child, who was now two-and-a-half years old. The Defendant said that he and the victim should have taken "some time apart and got [their] shit together," but instead they got married. The Defendant said that he neglected to address his own drug issues instead focusing on the victim's problems, which included smoking crack, drinking a "case" a day, and taking Adderall.

On the recording, the Defendant tells the detective that, during their marriage, every time he did something wrong, the victim would "snap at [him]." While he would get angry and "cuss," he never got physical with her. She was the only one who "ever got physical." After about a year, the Defendant "regressed into a bad state and . . . started drinking a lot." The victim told the Defendant that the child he thought they shared might not be his child. The victim said she wanted to "move out and have fun" and that she "shouldn't have to give up the best years of [her] life for [the Defendant]." The Defendant said that the victim moved out about a month and a half before her death. The Defendant said that the two were in counseling, and, in fact, had a counseling appointment the following day.

The State then stopped the recording, informing the trial court that the portion played was indicative of the entire recording. Detective Kilgore testified that during the remainder of the interview the Defendant detailed the night/early morning hours of March 2nd and the manner in which he killed the victim. The detective also recalled that he asked the Defendant about the Defendant's frame of mind at the time of the interview, and the Defendant said that he was in the right frame of mind and that he remembered everything that he had said to the detective. The detective concluded the interview at 3:22 p.m. Detective Kilgore testified that, shortly after this interview, he swore out an arrest warrant for the Defendant, who was transported to a mental health facility.

7

On cross-examination, the detective testified he was not with the Defendant when the Defendant arrived at the hospital. The detective did not recall whether he spoke with a doctor about the Defendant's condition before speaking with the Defendant. He said that he was informed that the Defendant was talking to nurses, so he went and talked to the Defendant. There were two other officers present at the hospital when Detective Kilgore arrived, but he did not know if either of them spoke with the Defendant. The detective said that, after the interview, he spoke with the Defendant's parents briefly. They expressed concern for the Defendant's son, their grandchild. The Defendant's father spoke to the detective about the Defendant's relationship with the victim and about the Defendant's past history.

Upon questioning by the trial court, the detective testified that the Defendant did not appear to be under the influence of alcohol at the time he gave his statement. The Defendant's speech was not slurred, he did not stumble over his words, and he did not smell of alcohol.

Sergeant Julie Dean, with the Chattanooga Police Department, testified that she was briefly in the room with the Defendant during his hospitalization. She said she was at the hospital when the Defendant awoke, and she informed the detective that the Defendant was awake. She did not speak with the Defendant about anything involving this case or the circumstances leading to his hospitalization. She said she was present when the detective read the Defendant his rights and when he signed the form waiving those rights. The sergeant also signed that form. She then left the Defendant's room and was not present during his statement to the detective.

Phillip Lewis, a crisis intervention specialist at Volunteer Mental Health, testified he conducted a mental health evaluation of the Defendant on March 2, 2008. He said the hospital, where the Defendant was in the ICU, contacted him at around 6:00 p.m., and he arrived at the hospital at around 7:45 p.m. Lewis testified he reviewed the hospital records before evaluating the Defendant, and those records indicated that the Defendant suffered from a self-inflicted injury when he placed a plastic bag over his head. The records also indicated that alcohol, but not drugs, were involved. Lewis asked the Defendant a series of questions related to the Defendant's emotional status, and, in response, the Defendant described for Lewis his relationship with the victim. Lewis described the Defendant's relationship with the victim as a "long-term dysfunctional relationship" where the victim frequently moved in and out of their shared home. The Defendant indicated to Lewis that he had problems with alcohol and said that he had been drinking that day. The Defendant denied any drug use.

Lewis said that, during the interview, he noted that the Defendant's speech was

8

"rather slow" or "restricted" and that he "[h]ad difficulty answering questions," because he seemed "[v]ery distracted." Lewis said the Defendant seemed "[f]ully oriented" but also lethargic and "very sad." He further said the Defendant was "very tearful, distraught." Lewis said that the Defendant made several references during the evaluation to wanting to harm himself, leading Lewis to indicate on his report that the Defendant was "self-destructive." Lewis said his reports from the evaluation indicated that the Defendant seemed "focused on death" and that the Defendant reported "seeing shadows." The Defendant, who was lucid, had slow body movement, a poor memory, and a poor ability to concentrate.

Lewis testified that, at the conclusion of the evaluation, Lewis determined that the Defendant needed inpatient hospitalization at Moccasin Bend Mental Health Institute. Lewis said this was necessary to stabilize the Defendant and keep him safe. Lewis described the multiple stressors upon the Defendant at the time and described his level of functioning as being on the low-end of the scale. Lewis recounted that the Defendant's treating physician agreed with Lewis's assessment.

On cross-examination, Lewis agreed that physicians had determined that the Defendant was medically stable by the time Lewis evaluated him. Lewis said that the Defendant was able to understand Lewis's questions and answer them. Lewis recalled the Defendant seemed "overwhelmed" and "sad," but he agreed that, at the time, the Defendant was aware he was going to be charged with the victim's murder. Lewis said his notes indicated the Defendant told him, "I don't see nothing left to live for. I don't deserve to be alive right now."

Upon questioning by the trial court, Lewis testified that he only evaluated patients who consented and, if they refused to speak to him, he ceased the evaluation. He said he would not evaluate someone who he deemed unable to give consent to speak to him. Lewis agreed that, at the time of the Defendant's evaluation, the Defendant had sufficient judgment to make an informed decision to speak with him. Lewis opined that the Defendant understood Lewis's questions and answered appropriately. Lewis also opined that the Defendant was "sober" at the time of the interview. Lewis said that, during the evaluation, the Defendant responded to questions about the circumstances that led to his hospitalization, his educational status, drug history, religious background, and mental health history. At the time of the evaluation, the Defendant appeared to know that he going to be charged with the victim's murder. Lewis said that he found the Defendant's intellectual functioning "average," similar to a majority of the population. Lewis said that, while the Defendant said he was "seeing shadows," Lewis observed no behavior indicating that the Defendant was hallucinating.

Based upon this evidence, the trial court ruled that the statement was admissible. It

made findings of fact based upon the evidence, and then discussed the Defendant's recorded statement, stating:

> The [D]efendant's recorded statement is thirty four minutes and fourteen seconds in length. The statement does not exhibit any evidence of impairment. The [D]efendant was very expressive and was completely open with the detective. The [D]efendant spoke clearly and did not appear to be reserved or apprehensive. There was no indication of any unwillingness on the part of the [D]efendant to speak with the detective nor was there any evidence of coercion. The [D]efendant's thought patterns and communications were clear, coherent, and logical with regard to his explanation of events and motives. The [D]efendant had a good memory and recall regarding past and present events about both himself and his wife. He was able to give a detailed explanation regarding marital problems he was experiencing and about counseling including the name of his counselor and the number of sessions attended. The [D]efendant described step by step how he argued with the victim, killed her, left the house, returned to kill himself and the steps he took in an effort to kill himself. The [D]efendant stated that he had ingested one glass of Early Times liquor during the evening and that he took a large number of pain killers and muscle relaxers that had been prescribed for his victim/wife after the murder in an effort to kill himself.

The trial court then concluded that the Defendant's waiver of his *Miranda* rights and his confession were knowing and voluntary. The trial court stated:

> The Court finds that the [D]efendant is a high school graduate, who was twenty-three years old and functioning on an average intellectual level at the time of the waiver. The Court finds that there was no repeated or prolonged interrogation or prolonged detention prior to the waiver. The [D]efendant was advised of his Constitutional rights and initialed and signed the rights waiver form to acknowledge that he understood the rights. The [D]efendant was not intoxicated. The [D]efendant's health condition did not impair his ability to knowingly, intelligently and understandingly waive his rights. There is no evidence that the [D]efendant was deprived of food, sleep or medical attention. The [D]efendant was not threatened or physically abused.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it concluded that the Defendant made his statement after a knowing, willing, voluntary waiver of his *Miranda*

10

rights. He points to the facts that, before giving the statement, he had tried to kill himself by ingesting painkillers and placing a bag over his head. He was taken to the ICU, where he was "unresponsive" and where doctors determined he suffered from an anoxic brain injury. The statement was taken shortly after he regained consciousness and before he was discharged to a mental health hospital. At the time of the statement he was "distraught," "withdrawn," and tearful. His decision-making ability was poor and his impulse control was impaired. He asserts that based upon these factors, among others, he could not have knowingly and intelligently waived his Miranda rights. The State counters that the record supports the trial court's ruling and cites to multiple facts from the record supporting the ruling.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions," the accused "shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. An accused, however, may waive this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Miranda*, the United States Supreme Court held that a suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Id.* at 479. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. *Id.* Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*. *Id.* at 444. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the

circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994).

The fact that a person suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving constitutional rights. *See generally State v. Middlebrooks*, 840 S.W.2d 317, 327 (Tenn. 1992); 4 Wharton's Criminal Evidence § 643 (14th ed.1987). A person with a mental deficiency may waive his *Miranda* rights if that waiver was knowingly and voluntarily made. *State v. Green*, 613 S.W.2d 229, 233 (Tenn. Crim. App. 1980); *Braziel v. State*, 529 S.W.2d 501, 505-06 (Tenn. Crim. App. 1975). When determining whether an accused has voluntarily, knowingly, and intelligently waived his *Miranda* rights, this Court must consider the totality of the circumstances which existed when the accused waived these rights. *Middlebrooks*, 840 S.W.2d at 326; *State v. Benton*, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988). The "totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)). In determining if a confession was voluntary, courts are to consider the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (citing *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)). However, no single factor is necessarily determinative. *Blackstock*, 19 S.W.3d at 208.

After reviewing the record and the Defendant's statement and considering the totality of the circumstances, we conclude that the Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. The Defendant was a high school graduate and twenty-three years old at the time he gave his statement to police. The Defendant was not questioned extensively before he signed the waiver of his rights, and his interview with the detective lasted slightly more than an hour. The Defendant was not deprived of food, water, sleep, or medical attention, and he received neither threats nor physical abuse. There was

12

conflicting testimony about the extent to which the Defendant may have been "injured" or "intoxicated." When he first arrived at the emergency room, he was unresponsive and displayed a lack of reflexes during his medical examination. Upon waking, however, he interacted with his parents. On the tape, he speaks clearly, understandably, and sensibly. The neurologist who examined the Defendant within an hour of the Defendant giving police his statement testified that the Defendant's "thought processes were pretty clear." The doctor further concluded that, neurologically speaking, the Defendant could be discharged from the hospital. The Defendant's assertions that his unresponsiveness, when he was admitted to the emergency room at 7:00 a.m., rendered him incapable of making a knowing waiver do not preponderate against the findings of the trial court. We conclude the trial court did not err in finding that the Defendant knowingly and voluntarily waived his *Miranda* rights and, therefore, the trial court did not err when it denied the Defendant's motion to suppress his statement. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Having thoroughly reviewed the record and relevant authorities, we conclude that the trial court did not err when it denied the Defendant's motion to suppress his statement to police. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

13