# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 26, 2000 Session

## STATE OF TENNESSEE v. ALMEER NANCE

**Direct Appeal from the Criminal Court for Knox County**
No. 61277      Ray L. Jenkins, Judge

---

**No. E2000-00170-CCA-R3-CD**
**October 23, 2001**

---

Following the transfer of his case from juvenile court, a Knox County grand jury indicted the defendant on one count of premeditated murder, one count of felony murder, one count of especially aggravated robbery, two counts of especially aggravated kidnapping, three counts of aggravated robbery, one count of aggravated assault, and two counts of theft over one thousand but under ten thousand dollars. Prior to trial the defendant filed an unsuccessful motion to suppress the statement he gave to authorities. The case proceeded to trial wherein the defendant was convicted as charged on seven of the aforementioned counts: more specifically, the jury found him guilty of the felony murder, especially aggravated robbery, especially aggravated kidnapping, and aggravated robbery offenses. For these crimes he received an agreed upon effective sentence of life plus twenty-five years in prison. He then filed a "Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial" alleging the trial court erred in failing to suppress his statement. After the denial of this motion, the defendant brought the instant appeal again raising the suppression issue. However, upon reviewing the record and applicable case law, we affirm the trial court's denial of the motion to suppress the defendant's statement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Susan E. Shipley, Knoxville, Tennessee, for appellant, Almeer Nance.

Paul G. Summers, Attorney General & Reporter; Patricia C. Kussmann, Assistant Attorney General; Randall E. Nichols, District Attorney General; William Crabtree and Jo Helm, Assistant District Attorneys, for appellee, State of Tennessee.

# OPINION

## Factual Background

      As the defendant does not challenge the sufficiency of the convicting proof, we will only briefly address the evidence supporting the convictions. Essentially, on January 16, 1996, the defendant and Robert Manning robbed at gunpoint Scott's Market in Knoxville. Two days later Manning picked up the defendant at the defendant's home. Amanda Goode accompanied the pair. In looking for a place to rob, the three finally came to a Radio Shack. Goode stayed in the car while Manning and the defendant, wearing toboggans/ski masks, entered the store. Both men were once more armed with guns, and in the process of the robbery, the store clerk, Joseph Ridings, was shot in the head.[1] He subsequently died from this wound. Upon leaving the store, Manning and the defendant rejoined Goode in a stolen Mazda, and the trio drove from the scene. They then discovered a raised garage door at the home belonging to Arthur and Patsy Sipf. Again, Manning and the defendant exited the car. Finding the door from the garage to the living area of the home unlocked, the two proceeded into the house. Once more the pair donned toboggans/ski masks.[2] They stole items from the home while holding both Sipfs on the floor at gunpoint. The offenders then forced the couple into the trunk of one of the Sipfs' cars. Having done so, Manning and the defendant left in an automobile belonging to the Sipfs.[3] Goode continued in the Mazda. At this point we note that the defendant was apparently returned to his home. He was not convicted of any offenses committed after the encounter with the Sipfs.

      Some days thereafter, the authorities captured Manning and Goode in Kentucky and therefrom gained information about the defendant's involvement in these crimes. The police arrested the defendant in the early morning hours of January 22, 1996, and subsequently obtained a signed waiver and confession from him.

      Prior to trial defense counsel unsuccessfully attempted to have this statement suppressed.[4] The trial court conducted a hearing on this motion with four witnesses providing testimony.

      First Detective Clyde Cowan set out his account of what had happened at the defendant's home and at the Knox County Central Facility. According to Cowan he observed Sergeant Andy Young and Lieutenant Fred Ludwig speaking with the defendant's mother at the defendant's

---

[1] The record provides slightly conflicting proof as to whether it was Manning or the defendant who actually fired the fatal shot.

[2] Though Manning stated that the defendant had not worn a mask at the Sipfs' the defendant acknowledged that he had done so. Furthermore, Arthur Sipf also suggested that such was the case.

[3] Manning could not clearly recall if the defendant had left in the Sipfs' car also.

[4] Information concerning the taking of the defendant's statement was presented at both the juvenile and criminal court levels; however, most of the testimony referenced in this opinion will be that arising out of the criminal court hearing on the defendant's motion to suppress.

residence.[5] Cowan also claimed to have talked with the defendant's mother, explaining to her why the police were there; however, he acknowledged that he had not asked her permission to speak with the defendant. Nevertheless, the defendant was transported to the Knox County Central Facility to be interviewed. Detective Dan Stewart joined Cowan in this endeavor and began by advising the defendant of the reason for the interview and of his constitutional rights. Cowan further stated that at that point the defendant had indicated that he wanted his attorney, and Stewart left to call the public defender's office.[6] Upon his return, Stewart allegedly informed the defendant "that he wasn't able to make contact with that person or that agency, and it would be the next day." Both detectives then left the defendant alone, and Cowan testified that the plan at that point was to transport the defendant to "Juvenile." However, when Cowan went into the room to retrieve his coat, the defendant volunteered that he wished to talk. Cowan asked Stewart to return; the defendant was again advised of his rights; a rights waiver form was executed at 2:45 a.m.; the defendant talked about the events in question and a recorded statement concerning the offenses was subsequently taken. Additionally, Cowan affirmed that he had not promised, threatened, or coerced the defendant in order to gain the contested statement.

The defendant then called Dan Stewart. Early in his testimony Stewart acknowledged having incorrectly stated during the juvenile court hearing that the defendant had not requested an attorney. However, Stewart also explained that he had retracted this statement upon refreshing his memory at the previous hearing using his handwritten notes taken contemporaneously with the defendant's interview. He further recounted that following the defendant's request for an attorney he had called the public defender's office. The call was answered by a recording telling him to call during office hours. Stewart then "told [the defendant] what the phone call had resulted in" and later learned that the defendant had changed his mind and would talk without a lawyer. After this, Stewart returned to the room where the defendant was and took a statement from him. Stewart testified that the defendant had been advised of and had waived his rights as reflected in the waiver form; the officers had then talked with the defendant about the offenses; the defendant had subsequently given a recorded statement; and no promises, threats, or coercion had been employed to obtain the statement. In addition, this witness was quite clear that he had said nothing else to the defendant until being advised that the defendant wished to speak without counsel.

Providing further relevant information was Sergeant B. A. Young of the Knox County Sheriff's Department. According to this officer he was at the defendant's home when the arrest was made and talked with the defendant's mother. More specifically, Young testified that he had told Ms. Nance to calm down and had informed her that they were there "to talk to her son about a criminal offense and look around for weapons ... used in the criminal offense." She allegedly responded by "stat[ing] that she'd already told the officers that they could talk to her son and ... look around, just [don't] wreck her apartment or hurt her son." Briefly thereafter, Young transported the defendant to the Central Building but did not talk with him during this time. On cross-examination,

---

[5] At the time of the arrest, the defendant lived with his mother and brother.

[6] Though Cowan stated that he could not remember whether the defendant had mentioned the public defender's office or legal aid, Stewart's notes indicate that it was the public defender's office which had been requested.

Young admitted that he had neither advised the defendant of his rights nor had he told the defendant's mother where he was taking the defendant.[7]

Finally, the defendant gave his account concerning the night of his arrest and the taking of his statement. He stated that no one had read him his rights at the time of the arrest but also no one had questioned him at the scene. However, he testified that the officers at the Central Building had informed him that he had to sign the waiver before he could be appointed an attorney. The defendant further claimed that in telling him that an attorney from the public defender's office could not be reached at that time, Stewart had added comments such as: "that's how much they care about you ... ain't nothing they could do for [you] ... no need in [you] trying to go through all that, get no lawyer or nothing [sic] ... just tell [me] and [I] can tell [your] attorney...." Additionally, the defendant alleged that he had asked for an attorney numerous times that night before finally talking with the detectives. Turning to cross-examination, the defendant admitted that he had been arrested on two prior occasions; had been read his rights on at least one of these; and had previously been represented by an attorney from the public defender's office. Nevertheless, the defendant alleged that he had thought the tape recording of his statement had been for his future attorney to expedite the resolution of his case.

After hearing this testimony and listening to arguments of counsel, the trial court rendered its decision through a written order denying the motion to suppress.

The defendant was tried and convicted of the multiple offenses as aforementioned. He now contends that his convictions should be reversed and remanded for a new trial because the trial court committed error in admitting his statement.


### Admission of the Defendant's Statement

As his sole issue, the defendant avers that the trial court erred by refusing to find a violation of his constitutional rights in the taking of his statement. The defendant particularly emphasizes that he invoked his right to an attorney and that he was a minor at the time of questioning. Because of his age at that time, he asserts that the evaluation of his situation should receive heightened scrutiny by this Court.

### A. Standard of Review

At the outset we note that "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." State v. Keen, 926 S.W.2d 727, 741 (Tenn. 1994); see also, State v. Robert Blocker, No. E1999-01624-CCA-R3-CD, 2000 WL 726447 at *2 (Tenn. Crim. App. at Knoxville, June 5, 2000); State v. Carroll, 36 S.W.3d 854, 864-65 (Tenn. Crim. App. 1999) (quoting State v. Andrade Bruce Williams, Jr., No. 01C01-9803-CR-00104, 1999 WL 191782 at *3 (Tenn. Crim. App. at Nashville, April 8, 1999)). In addition, the findings of fact made by the trial court at a hearing on a motion to suppress will also be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness

---

[7] Young also indicated that Ms. Nance had not asked where he was taking the defendant.

credibility, "the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge." Id.

## B. Waiver of Right to Counsel

As above-noted, the trial court found that the defendant had invoked his right to counsel when his rights were initially explained to him. However, in its order denying the motion to suppress, the trial court also found that the defendant had initiated further communication and that, under the rationale of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), no error had occurred.

In Edwards, the United States Supreme Court held that "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885. If an accused remains silent and cuts off questioning, that silence must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 103-04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). If, on the other hand, a statement is made after the invocation of the right to counsel, the court must consider whether the accused initiated the further conversation, and whether, given the totality of the circumstances, the waiver of counsel was knowing and intelligent. Oregon v. Bradshaw, 462 U.S. 1039, 1043-46, 103 S.Ct. 2830, 2834-35, 77 L.Ed.2d 405 (1983); see also State v. Claybrook, 736 S.W.2d 95, 102-03 (Tenn. 1987).

The first question to be answered, therefore, is whether the defendant did, in fact, re-open the dialogue with the authorities. In this respect the evidence supports the trial court's conclusion. For example, testimony exists that the defendant asked for the public defender. Stewart then called the office and received a recording. He informed the defendant of this fact and no further questions were asked of the defendant. Shortly thereafter, intending to retrieve his coat, Detective Cowan re-entered the room where the defendant was; and unprompted, the defendant indicated his desire to speak with the officers.

## C. Evaluation of Confessions by Juveniles

Having found that following his request for an attorney, the defendant initiated further conversation with police, the inquiry becomes whether the defendant's waiver of his rights was knowingly and voluntarily entered. See Bradshaw, 462 U.S. at 1044-47, 103 S.Ct. at 2834-35; Edwards, 451 U.S. at 486 n.9, 101 S.Ct. at 1885 n.9.

In State v. Callahan, 979 S.W.2d 577 (Tenn. 1998), the Tennessee Supreme Court held:
that juvenile waivers shall be analyzed under a totality-of-the-circumstances test that requires consideration of the following factors:
(1) ... all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
(2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;

(3) the juvenile's familiarity with <u>Miranda</u> warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

<u>Id</u>. at 583. The supreme court further provided that "[w]hile courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." <u>Id</u>.

Turning to the evidence in this case, we find that the defendant's statement was properly admitted. While factors surrounding the taking of the statement such as the extreme lateness of the hour and the mother's absence are of some concern, the evidence relative to the entire situation supports the trial court's denial of the motion to suppress the defendant's statement.[8]

As above-noted, we are to examine these claims in light of the totality-of-the-circumstances using the aforementioned criteria. Two days after the taking of the contested statement, the defendant turned seventeen-years-old. The defendant had previous experience with the court system, attorneys, and advice concerning his constitutional rights. According to a psychological evaluation made an exhibit to the record, the defendant possessed average intelligence.[9] There seems to be no question about the defendant's ability to read the rights form because he acknowledged doing so. We further note Detective Cowan's testimony that Stewart read the rights to the defendant and allowed the defendant time to read each individual right and then initial on the line beside each right if the defendant understood it. The waiver form submitted as an exhibit bears the defendant's initials on the line next to each right. Again referring to the <u>Callahan</u> factors, we observe that there was no allegation of intoxication which would have interfered with the defendant's ability to comprehend and knowingly waive his constitutional rights. It appears that the defendant knowingly and voluntarily elected to talk to police.

### Conclusion

For the foregoing reasons we conclude that no part of the defendant's allegation merits relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE

---

[8] In <u>Braziel v. State</u>, 529 S.W.2d 501 (Tenn. Crim. App. 1975), this Court found that the "[t]he voluntariness and admissibility of a juvenile's confession is not dependent upon the presence of his parents or attorneys at the interrogation when there has been a full <u>Miranda</u> warning given and understood." <u>Id</u>. at 506.

[9] While the report further indicates that the defendant showed signs of insecurity and an eagerness to please, this is insufficient for a finding that the defendant's statement was involuntary.